IN THE CIRCUIT COURT OF THE
SEVENTH JUDICIAL CIRCUIT, IN AND
FOR ST. JOHNS COUNTY, FLORIDA

CASE NO.: CA11-0950

DIVISION: 55

3:11-cv-714-J-25TEM

MELVIN S. TENNYSON,
an individual,

    Plaintiff,

v.

HARBINGER TECHNOLOGIES GROUP, LLC,
a Virginia corporation,

    Defendant.
_____/

## COMPLAINT

Plaintiff, MELVIN S. TENNYSON, by and through his undersigned attorney, sues Defendant, HARBINGER TECHNOLOGIES GROUP, LLC, and in support thereof states:

### JURISDICTION

1. This Court has jurisdiction because the contract was executed in St. Johns County, Florida and Plaintiff's services were rendered from St. Johns County, Florida.

2. Venue is proper because the Plaintiff's injury occurred in St. Johns County, Florida.

### PARTIES

3. MELVIN S. TENNYSON, is a resident of St. Johns County, Florida, and is a party to the attached Employment Agreement.

4. HARBINGER TECHNOLOGIES GROUP, LLC is a foreign corporation with principal headquarters in the State of Virginia, and is a party to the attached Employment Agreement.

## FACTS

5. On or about September 1, 2010, Defendant entered into an Employment Agreement with Plaintiff. (See attached Exhibit "A").

6. Pursuant to Section 1.2 of the Employment Agreement, Defendant agreed to an initial employment term of five (5) years.

7. Pursuant to Section 1.4(a) of the Employment Agreement, Defendant agreed to pay Plaintiff a salary at the annual rate of Ninety-Thousand Dollars ($90,000.00).

8. At all times material prior to April 15, 2011, Defendant paid in accordance with the terms of the Agreement.

9. In or about March, 2011, Defendant telephoned Plaintiff proposing that Plaintiff's contract be modified such that Defendant would pay Plaintiff as an Independent Contractor at which time Plaintiff rejected the proposed offer.

10. As of today's date, Defendant has failed to compensate Plaintiff and failed to reimburse Plaintiff for April and May, 2011 pursuant to the terms of the Employment Agreement.

11. Defendant's failure to pay Plaintiff as agreed to has resulted in a Breach of the Employment Agreement.

12. Defendant is now indebted to Plaintiff in the amount of $419, 273.00 which includes payment for the remainder of the contract, reimbursement for health insurance costs, and reimbursement for travel expenses.

13. Because of Defendant's breach, Plaintiff has had to hire this lawfirm.

14. All conditions precedent to bringing this lawsuit have been satisfied.

## COUNT I: BREACH OF EMPLOYMENT CONTRACT

15. Plaintiff restates and realleges paragraphs 1 through 14 herein.

16. On or about September 1, 2010, Defendant entered into an Employment Agreement with Plaintiff. (See attached Exhibit "A").

17. At all times material, Plaintiff fully performed under the terms of the Employment Agreement.

18. Defendant breached the contract with Plaintiff by failing to pay Plaintiff as agreed to and there remains an unpaid balance of $419, 273.00.

19. As a result of Defendant's breach, Plaintiff has been damaged in the amount of $419,273.00.

WHEREFORE, Plaintiff requests this honorable court find for judgment against Defendant in the amount of $419, 273.00, plus pre-judgment and post-judgment interest, attorney's fees, and costs as allowable and for such other and further relief as the Court may deem just and equitable.

Respectfully submitted, this 14th day of June, 2011.

WILLIAM R. HUSEMAN, P.A.

David S. Fursteller, Esq.
Florida Bar No.: 89038
William R. Huseman, Esq.
Florida Bar No.: 494941
3733 University Blvd. W, Suite 305-A
Jacksonville, Florida 32217
Telephone: (904) 448-5552
Facsimile: (904) 448-5653
Email: david@jaxattys.com

Attorney for Plaintiff:
Melvin Smitty Tennyson

## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (this "Agreement"), made as of this first day of September, 2010 (the "Effective Date"), by and between Harbinger Technologies Group, LLC ("Harbinger") and M. Smith Tennyson, a resident of St. Augustine, Florida ("Executive").

### RECITALS:

A. Harbinger desires to employ Executive as Harbinger's Vice President and Senior Consultant and to accept in connection therewith certain assets from Executive on the terms and conditions set forth in this Agreement; and

B. Executive is willing to accept employment with Harbinger, desires to serve as Harbinger's Vice President and Senior Consultant, and in connection therewith desires to transfer ownership to Harbinger of certain assets, on the terms and conditions set forth in this Agreement.

NOW, THEREFORE, in consideration of the premises and mutual promises contained in this Agreement, the receipt and sufficiency of which are hereby acknowledged, IT IS AGREED as follows:

### SECTION I

### EMPLOYMENT

1.1 Employment. Harbinger hereby agrees to employ Executive and Executive hereby accepts employment with Harbinger on the terms and subject to the conditions set forth in this Agreement.

1.2 Term and At Will Employment. The term of Executive's employment hereunder shall continue for an initial term of five (5) years beginning on the Effective Date (the "Initial Term"), subject to renewal following the expiration of the Initial Term upon mutual agreement of Harbinger and Executive. No later than six (6) months prior to the end of the Initial Term, Harbinger and Executive will negotiate in good faith for a renewal of the term of the Agreement. Following the Initial Term, absent any renewal term agreed to by Harbinger and Executive, Executive's employment with Harbinger shall be at-will.

The Initial Term and any renewal term, until terminated pursuant to this Agreement, shall constitute the "Term of Employment."

# EXHIBIT "A"

1.3   Duties.

(a) Executive shall serve as Vice President and Senior Consultant of Harbinger. As Vice President and Senior Consultant of Harbinger, Executive shall report to the President of Harbinger (the "President"). With respect to such office, Executive shall render such business and professional services in the performance of his duties, consistent with Executive's position within Harbinger, as may reasonably be assigned from time to time by the President or such other person as the President may delegate. Executive shall hold such further positions with Harbinger and with any of its subsidiaries or affiliates, as Harbinger shall reasonably specify from time to time. Executive shall perform such duties and responsibilities conscientiously, in good faith and to the best of his ability, giving to Harbinger the full benefit of his knowledge, expertise, skill and judgment.

(b) Executive shall not, during the Term of Employment, without the prior written consent of the President, render services of a business, professional or commercial nature, whether or not for compensation, to any other person or entity other than Harbinger, nor engage or participate in any trade or business activities other than in connection with the performance of his duties hereunder. The foregoing shall not, however, preclude Executive (i) from engaging in appropriate civic, charitable, or religious activities or (ii) from devoting a reasonable amount of time to private investments and other business activities arising from such investments (other than any business that is a current or potential competitor of Harbinger), so long as the foregoing activities and services do not conflict with Executive's responsibilities to Harbinger or the terms of this Agreement. All material outside non-personal activities of Executive will be subject to prior written approval from the President.

(c) Executive shall be employed on a full-time basis and devote his entire working time, attention, energy, and skills to performance of the services, duties and responsibilities connected to such employment while so employed.

1.4. Compensation.

(a) Salary. As compensation for Executive's services hereunder, Harbinger shall pay to Executive during the Term of Employment a salary at the annual rate of Ninety Thousand Dollars ($90,000), payable in accordance with the regular payroll practices of Harbinger as in effect from time to time and subject to applicable tax and other withholdings (the "Base Salary"). Executive shall receive an annual salary review on or about April 1 of each calendar year in accordance with Harbinger's practices and procedures for review and adjustment of corporate salaries.

(b) Bonus and Incentive Compensation. In addition to the Base Salary, and subject to the terms and conditions set forth herein, including the achievement of certain performance objectives that the President may establish during the Term of Employment, (i) Executive shall be eligible to receive an annual cash bonus of up to Sixty Thousand Dollars ($60,000) ("Bonus") for total annual compensation of up to One Hundred and Fifty Thousand Dollars

1.4(b) above, and (ii) Executive shall not be entitled to, and Harbinger shall not have any obligation to allow, admission of Executive as a Member of Harbinger pursuant to Section 1.4(e) above or otherwise.

       2.5 Upon Termination. Upon termination of his employment with Harbinger, Executive shall immediately return to Harbinger all memoranda, records, notes, reports, customer lists, pricing information, data, technical information and other documents or recorded information of any kind and in any form of media relating to Harbinger or its subsidiaries or affiliates, and any copies thereof, and any other property of Harbinger or its subsidiaries or affiliates of any kind that may be in Executive's possession or under his control.

       2.6 Conditions to Receive Payments. Subject to the provisions of any law or applicable regulation to the contrary, any payments described in this Section II will be provided to Executive only if the following conditions are satisfied: (i) Executive has complied with all other provisions of this Section II; (ii) Executive has and continues to comply with all other provisions of this Agreement and any other confidentiality or proprietary rights agreement signed by Executive; and (iii) Executive executes and delivers to Harbinger, and does not revoke, a full general release, in a form acceptable to Harbinger, releasing all claims, known or unknown, that Executive may have against Harbinger, and any subsidiary or related entity, their officers, directors, employees and agents, arising out of or any way related to Executive's employment or termination of employment with Harbinger.

## SECTION III

## CONFIDENTIAL INFORMATION, NON-COMPETITION, AND INTELLECTUAL PROPERTY/NEW DEVELOPMENTS

       3.1 Nondisclosure of Confidential Information. Executive agrees to treat as confidential and retain in the strictest confidence and shall not voluntarily use, divulge, disclose or make accessible to any other firm, partnership, corporation or any other person or entity outside Harbinger any Confidential Information (as hereinafter defined) except in connection with his good faith efforts on behalf of Harbinger or any of its subsidiaries or affiliates. As used herein, "Confidential Information" shall mean any information of a confidential or non-public nature relating in any way to Harbinger or any of its subsidiaries or affiliates or their respective businesses, including, without limitation, information concerning Harbinger's financial data, strategic or other business plans, product development (or other proprietary product data), customer lists, pricing information, other customer or prospective customer data, technical information, trade secrets or know-how, proposals, support data, supplier lists, employee lists, marketing plans, software, processes, inventions and devices. Notwithstanding the foregoing, information shall not be deemed "Confidential Information" if Executive can demonstrate that such information (i) is now or hereafter became available to the public other than as a result of disclosure by Executive; (ii) became available to Executive

on a non-confidential basis from a source other than Harbinger or any of its subsidiaries or affiliates which source was not under an obligation to Harbinger or any of its subsidiaries or affiliates (whether contractual, legal or fiduciary) to keep such information confidential; (iii) is, in the opinion of counsel for Executive, required to be disclosed for Executive not to be in violation of any applicable law or regulation; or (iv) is required to be disclosed pursuant to an order of, or is necessary to be disclosed in connection with any litigation or other proceeding in which testimony is compelled before, any court or like entity or governmental authority; provided that in any such case, Executive shall provide Harbinger with prompt notice of such request, order or intended disclosure, including copies of any preliminary or final subpoenas, orders, filings and the like requesting or containing such Confidential Information, cooperate reasonably with Harbinger in resisting or limiting, as appropriate, the disclosure of such Confidential Information via a protective order or other appropriate legal action, and shall not make disclosure pursuant thereto until Harbinger has had a reasonable opportunity to resist such disclosure, unless he is ordered otherwise.

3.2 Nondisclosure and Non-Use of Former Employer Information. Executives agrees that he will not, during his employment with Harbinger, improperly use of disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that Executive will not bring onto the premises of Harbinger any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

3.3 Nondisclosure of Third Party Information. Executive recognizes that Harbinger has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on Harbinger's part to maintain the confidentiality of such information and to use it only for certain limited purposes. Executive agrees to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out Executive's work for Harbinger consistent with Harbinger's agreement with such third party.

3.4 Non-Competition.

(a) Executive acknowledges that, as a result of his positions with Harbinger, he will have access to information with respect to the development, implementation and management of Harbinger's business strategies and plans, including those which involve Harbinger's finances, products, services, marketing, operations, industrial and investor relations, and acquisitions. Accordingly, during the period of his employment hereunder and for a period of twelve (12) months immediately following the termination of Executive's employment relationship with Harbinger for any reason whatsoever, Executive agrees that he shall not, directly or indirectly, (i) in any capacity, carry on, be engaged in, assist, consult for or have any financial or other interest in any business which is in competition with the business of Harbinger (provided that a financial interest of not more than two percent (2%) in any company which is publicly traded and whose shares are listed on a national stock exchange or are quoted on NASDAQ shall be permitted); or (ii) directly or indirectly solicit, divert or

accept business from, or otherwise take away or interfere with, any customer or vendor of Harbinger including any person or entity who was a customer or whose business was being pursued by Harbinger on or prior to the date upon which Executive's employment relationship with Harbinger terminated. In addition, Executive shall not, on his own behalf or on behalf of any firm, partnership, corporation or any other person or entity, directly or indirectly, during the twelve (12) month period following his termination of employment hereunder, for any reason whatsoever, solicit or offer employment to any person who has been employed by Harbinger or any of its subsidiaries or affiliates at any time during the twelve months immediately preceding such solicitation, or solicit, offer or induce any person, entity or governmental authority that was under contract with Harbinger or any of its subsidiaries or affiliates while Executive was employed by Harbinger, or with whom Harbinger or any of its subsidiaries or affiliates was having discussions while Executive was employed by Harbinger, to discontinue its relationship with Harbinger or its subsidiary or affiliate, as applicable. For purposes of this Section 3.4, a business shall be deemed to be in competition with the business of Harbinger or any of its subsidiaries or affiliates if it is principally involved or if it has proposed to become principally involved in the purchase, sale or other dealing in any property or product or the rendering of any service purchased, sold, dealt in or rendered, by Harbinger or any of its subsidiaries or affiliates as a material part, or expected material part, of the business of Harbinger or such subsidiary or affiliate, as applicable.

(b) Executive and Harbinger agree that this covenant not to compete and the covenant not to solicit are reasonable covenants under the circumstances, Executive has been adequately compensated for such covenants, and further agree that if in the opinion of any court of competent jurisdiction such restraint is not reasonable in any respect, such court shall have the right, power and authority to excise or modify such provision or provisions of this covenant as to the court shall appear not reasonable and to enforce the remainder of the covenant as so amended.

3.5 Intellectual Property/New Developments. Executive agrees that any product, "know how," idea, formula, operational method, method of manufacture, invention, development, discovery, original works of authorship, improvements, designs, processes, computer programs, databases, trade secrets and related proprietary and confidential information or other knowledge or technical improvements (collectively, "Special Information"), whether patentable or not, in which he participates, or made or conceived by Executive, during his Term of Employment, whether made within or without the course of Executive's employment with Harbinger, which relates in any way to the business of Harbinger or any of its subsidiaries or affiliates and/or results directly or indirectly from Executive's employment with Harbinger shall be treated as owned by and for the benefit of, Harbinger, and as the property of Harbinger, and Executive shall, and hereby does, assign all of his rights to such Special Information to Harbinger without further compensation. Executive acknowledges that all original works of authorship that are made by Executive (solely or jointly with others) within the scope of Executive's employment hereunder and that are protected by copyright, are "works made for hire," as that term is defined in the United States Copyright Act (17 U.S.C. ss. 101). Executive hereby waives all moral rights relating to

all work developed or produced by him within the scope of Executive's employment hereunder, including without limitation any and all rights of identification of authorship and any and all rights of approval, restriction or limitation on use or subsequent modifications. Further, in such regard, Executive shall communicate and promptly disclose to the President all such Special Information to the extent such information is known at such time by Executive and will assist Harbinger in every proper way, at Harbinger's expense, to obtain a patent or patents thereon in the United States and any other jurisdiction that Harbinger deems appropriate, and Executive agrees to execute all instruments and to take all steps reasonably necessary to make the benefits of such Special Information available to Harbinger as its exclusive property.

3.6 Specific Enforcement. Executive agrees that any breach of the covenants contained in this Section III would irreparably injure Harbinger. Accordingly, Executive agrees that Harbinger may, in addition to pursuing any other remedies each may have under this Agreement or otherwise in law or in equity, obtain an injunction against Executive from any court having jurisdiction over the matter restraining any further violation of this Agreement by Executive.

## SECTION IV

## EXISTING CONTRACTS, CUSTOMER RELATIONSHIPS, VENDOR RELATIONSHIPS AND RELATED MATERIALS, INVENTORY AND INTELLECTUAL PROPERTY TRANSFERS

4.1 Contracts, Proposals, Customer Relationships, Vendor and Independent Consultant Relationships, Course Materials, Inventory, and Intellectual Property Rights to Transfer Without Liability. As a material inducement to Harbinger to enter into this Agreement, Executive shall convey, transfer and assign, or cause any affiliated entity to convey, transfer and assign, to Harbinger all of the Executive's or such affiliate's rights, title and interest in and to assets including those set forth in Schedule 4.2, free and clear of any and all liabilities and liens (collectively, the "Conveyed Assets"). Harbinger shall not assume by virtue of this Agreement, and shall have no other liability or obligation of any kind for any liability of the Executive or his affiliates. With respect to Contracts as hereinafter defined, Executive shall use his best efforts to cause each applicable Contract to be conveyed to Harbinger or to afford Harbinger the opportunity to enter into a contract with the customer on substantially identical terms and conditions.  With respect to all other Conveyed Assets, Executive shall use his best efforts to provide promptly such other duly executed, good and sufficient instruments of sale, conveyance, assignment or transfer, in form and substance reasonably acceptable to Harbinger, executed by Executive or his affiliates, reasonably necessary so as to vest in Harbinger good and valid title in and to the Conveyed Assets (including, with respect to any Conveyed Assets located or to be located in any jurisdiction, one or more bills of sale or similar conveyance documents as may be required under the law of the applicable jurisdiction to validly convey, assign and transfer such Conveyed Assets).

4.2 Such Conveyed Assets shall include, but not be limited to:

(a) agreements and contracts in which the Executive is engaged in or committed to the provision of service or the sale of products to a customer as of the Effective Date ("Contracts");

(b) proposals outstanding as of the Effective Date for the provision of services or products by the Executive or his affiliates ("Proposals");

(c) customer relationships of the Executive or his affiliates as of the Effective Date ("Customer Relationships");

(d) agreements, contracts, or other arrangements by which the Executive has obtained products or services useful or necessary to the fulfillment of Executive's obligations under the Contracts ("Vendor and Independent Consultant Relationships");

(e) the course and instructor materials and all brochures, user manuals, graphics and art work (in each case, in paper and electronic format) relating to the courses taught by the Executive or provided by his affiliates ("Course Materials");

(f) production equipment and any associated items, such as molds, used in the formulation and production of the products by the Executive and his affiliates; all material and product inventory, whether in process or finished; and all brochures, user manuals, graphics and art work (in each case, in paper and electronic format) and UPC codes relating to the products ("Equipment and Inventory");

(g) all information and technology, tangible copies, embodiments and things, in any media of any or all of the following: (i) Software (as hereinafter defined); (ii) inventions (whether or not patented or patentable), improvements, and other technology, (iii) Trade Secrets (as hereinafter defined); (iv) databases, works of authorship, data compilations and technical data; (v) tools, methodologies, processes, devices, prototypes, schematics, and hardware development tools; but in each case, not the Intellectual Property Rights (as hereinafter defined) therein ("Technology"); and

(h) any or all of the following and all statutory and/or common law rights throughout the world in, arising out of, or associated therewith:

1. all United States and other international and foreign patents and utility models and applications therefor, and all reissues, divisions, re-examinations, renewals, extensions, provisionals, continuations and continuations-in-part thereof, and equivalent or similar rights anywhere in the world in inventions and discoveries, including without limitation, invention disclosures and any rights therein ("Patents");
2. trade secrets and other know-how, show-how, technical data, techniques, or

other confidential or proprietary information ("Trade Secrets");

3. all copyrights, copyrights registrations and applications therefor, including all copyrights subject to protection under 17 U.S.C. Section 101, and all other rights corresponding thereto throughout the world ("Copyrights"), mask works, and mask work registrations and applications, and any other rights in works of authorship;

4. industrial designs and any registrations and applications therefor;

5. trade names, logos, trademarks and service marks, trademark and service mark registrations and applications ("Trademarks");

6. all rights in databases and data collections (including knowledge databases, customer lists and customer databases);

7. all rights in any and all computer software and code, including algorithms, routines, assemblers, applets, compilers, source code, object code, data (including image and sound data), design tools and user interfaces, in any form or format, however fixed including source code listings and documentation ("Software");

8. rights to Uniform Resource Locators, Web site addresses and domain names; and

9. any similar, corresponding or equivalent rights to any of the foregoing;

(collectively, the "Intellectual Property Rights"), and such Patent prosecution files, Software in electronic format, and all other documentation as may be relevant to the transferred Intellectual Property Rights.

## SECTION V

## MISCELLANEOUS

5.1 Parties Benefited; Assignment. This Agreement shall become effective as of the Effective Date and, from and after that time, shall extend to and be binding upon, and inure to the benefit of, Executive, his heirs and his personal representative or representatives, and Harbinger and its successors and assigns (including any assignee of substantially all the assets of Harbinger). Neither this Agreement nor any rights or obligations hereunder may be assigned by Executive.

5.2 Notices. All notices given or served hereunder shall be in writing and sent by (a) certified or registered mail, return receipt requested, (b) personal delivery, with receipt, (c) Federal Express, Express Mail or other reputable overnight courier service, with receipt, or (d) transmitted by telecopier (with postage prepaid mail confirmation) to the parties as follows:

If to Executive:

M. Smith Tennyson
3480 Kings Road South
St. Augustine, FL 32086

Fax No.: _____

If to Harbinger:

Harbinger Technologies Group, LLC
1600 Tysons Blvd., Suite 800
McLean, VA 22102
Attn: President
Fax No.: 801-382-5550

Any such notice shall be deemed to have been received on delivery, in the case of (b) above; on the second business day following mailing, in the case of (a) above; and on the first business day following mailing or transmission in the case of (c) or (d) above. Any party may change the address or telecopier number by giving notice to other party hereto.

5.3 Severability. Each section and subsection of this Agreement constitutes a separate and distinct provision hereof. It is the intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applicable in each jurisdiction in which enforcement is sought. Accordingly, if any provision of this Agreement shall be adjudicated to be invalid, ineffective or unenforceable, the remaining provisions shall not be affected thereby.

5.4 Integration and Amendment. This Agreement contains the full and complete agreement of the parties relating to the employment of Executive hereunder and supersedes all prior agreements, arrangements or understandings, whether written or oral, relating thereto. No amendment, supplement, modification, waiver or termination of this Agreement shall be binding unless executed in writing by the parties. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof, nor shall such waiver constitute a continuing waiver.

5.5 Disputes; Jurisdiction; Venue; and Waiver of Jury Trial. Any dispute or question arising either out of or relating to this Agreement shall be settled in accordance with the laws of the Commonwealth of Virginia, and each of the parties hereto hereby irrevocably submit to the jurisdiction of any federal or state court sitting in the Commonwealth of Virginia in any action or proceeding arising out of or relating to this Agreement, and each hereby irrevocably (i) agrees that all claims in respect of such action or proceeding may be heard and determined in any such court and (ii) waives any objection to the venue of any such court that each may have. Each of the parties irrevocably waives any right it may have to a trial by jury in any such action, suit or proceeding.

5.6 Survivorship. The respective rights and obligations of the parties hereunder shall survive any termination of this Agreement to the extent necessary to the intended preservation of such rights and obligations, including but not limited to those enumerated in Section III.